ESTATE OF JOSEPH G. BENNETT, DECEASED, RUBY L. BENNETT AND MICHAEL W. BENNETT, ADMINISTRATORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RUBY L. BENNETT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent [1]
Estate of Bennett v. Commissioner
Docket Nos. 22432-87; 22433-87
United States Tax Court
T.C. Memo 1989-681; 1989 Tax Ct. Memo LEXIS 681; 58 T.C.M. (CCH) 1056; T.C.M. (RIA) 89681; December 28, 1989
James J. Conroy, III, for the petitioners. Ruud L. Duvall, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies for the calendar year 1983 *682 in petitioner Estate of Joseph G. Bennett's Federal gift tax in the amount of $ 104,546.44 and in petitioner Ruby L. Bennett's Federal gift tax in the amount of $ 104,546.44. The issues for our consideration are (1) whether respondent is equitably estopped from asserting any deficiency in the Federal gift tax of petitioner Ruby L. Bennett, (2) whether respondent may amend his answer so as to assert an increased deficiency in petitioners' Federal gift tax, and (3) the fair market value of each of eighteen separate parcels of real estate transferred by gift. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions in the instant case were filed, petitioner Ruby L. Bennett and Michael W. Bennett, one of the administrators of the Estate of Joseph G. Bennett, resided in Arlington, Virginia. By deed of gift dated March 8, 1983 and recorded on April 7, 1983, petitioner Ruby L. Bennett ("Mrs. Bennett") and her late husband, Joseph G. Bennett ("the decedent"), gave eighteen separate residential properties (hereinafter collectively referred to as "the properties") to *683 their children. The properties, which were located in Arlington County, Virginia, were reported as having an aggregate value of $ 765,596.00 on the Federal gift tax returns of Mrs. Bennett and the decedent (Mrs. Bennett and the decedent will sometimes be referred to herein as "the Bennetts"), and a gift tax of $ 3,707.70 was reported and paid with each of their returns. On or about August 20, 1984, the Internal Revenue Service sent a notice to Mrs. Bennett. The notice stated that the amount of $ 138,685.59, including additional gift tax, penalties, and interest, was due with respect to Mrs. Bennett's 1983 Federal gift tax return and should be paid by August 30, 1984. On August 29, 1984, Mrs. Bennett wrote to the Internal Revenue Service asking for an explanation of the amount claimed. Several weeks later, Mrs. Bennett received an undated postcard from the Correspondence Section of the Internal Revenue Service which stated that the Internal Revenue Service was looking into the matter and that there should be an answer within 45 days. On or about September 21, 1984, the Internal Revenue Service sent a second notice to Mrs. Bennett, this time claiming an additional late payment *684 penalty and interest for a total amount due of $ 140,803.69. The Internal Revenue Service mailed a Final Notice (Notice of Intention to Levy) to Mrs. Bennett on or about October 19, 1984, in which a total of $ 142,639.69 in taxes, penalties, and interest was demanded. By letter dated November 8, 1984, Mr. James Conroy, III, counsel for petitioners in the instant case, wrote to the Taxpayer Assistance Section of the Internal Revenue Service in Memphis, Tennessee requesting an explanation of the amount claimed from Mrs. Bennett. Mr. Conroy's letter noted that Mrs. Bennett had received no response from the Internal Revenue Service with respect to her request for information. Mr. Conroy also wrote to the local Collection Department of the Internal Revenue Service in Bailey's Crossroads, Virginia, enclosing a copy of his letter to the Memphis office of the Internal Revenue Service and requesting the Collection Department to refrain from further action while awaiting a response from the Memphis office. Mr. Conroy was referred to Mr. Evan Brooks, an attorney at the Bailey's Crossroads office of the Internal Revenue Service, who said he would look into the matter. Mrs. Bennett subsequently *685 received a letter dated January 28, 1985 (the "January 28, 1985 letter"), which was handwritten on notepaper from the Internal Revenue Service's Problem Resolution Office. The January 28, 1985 letter, which was signed by Suzanne Battles, acknowledged receipt of Mr. Conroy's letter and stated that a "tax decrease" had been done and that the correct tax was $ 3,707.00. The January 28, 1985 letter also stated that Mrs. Bennett's original gift tax payment of $ 3,707.00 had been refunded to the decedent and that a new bill would be issued in two to three weeks, and apologized for the inconvenience. Mrs. Bennett later received a notice of adjustment from the Internal Revenue Service claiming the amount of $ 4,306.25, and paid that amount. [2]
Several months after the payment was made by Mrs. Bennett, Mr. Conroy received requests for additional information from Mr. Brooks of the Internal Revenue Service office in Bailey's Crossroads. In response to those requests, *686 petitioners hired an inspector, Mr. Bruce Beers, to prepare inspection reports with respect to certain of the properties. Mr. Conroy also sent Mr. Brooks a copy of the notice of adjustment previously received from the Internal Revenue Service and a copy of the check sent in payment of the notice. After furnishing the inspection reports to Mr. Brooks during the spring of 1985, petitioners did not hear from the Internal Revenue Service until December of 1986, at which time Mr. Brooks informed them that he had decided to pursue notices of deficiency with respect to the gift tax returns. Petitioners obtained additional inspection reports from Mr. Beers at that time. The statutory notices of deficiency in the instant case were issued to petitioners on April 14, 1987. The chart below summarizes the values of the properties as reported on petitioners' gift tax returns and the values of the properties determined by respondent in his statutory notices of deficiency. Value
Reported on
Value Determined
Address of Property
Gift Tax
in Statutory
Transferred by Gift
Returns
Notices
1.
3400 N. 21st Ave.
$ 53,440 $ 82,200   2.
1908 N. Nelson St.
43,120   74,500     3.
2005 N. Nelson St.
18,880   50,000     4.
1912 N. Nelson St.
21,560   47,400     5.
3406 N. 21st Ave.
46,240   55,000     6.
1904 N. Nelson St.
52,440   90,500     7.
2124 N. Quebec St.
42,800   83,700     8.
1817 N. Oakland St.
41,260   73,000     9.
1901 N. Oakland St.
53,760   87,800     10.
3402 N. 21st Ave.
53,440   103,900    11.
1913 N. Quebec St.
41,440   66,600     12.
1813 N. Oakland St.
39,260   45,000     13.
3412 N. 21st Ave.
54,640   82,500     14.
1814 N. Stafford St.
47,760   86,300     15.
3713 N. 20th St.
35,900   45,000     16.
3715 N. 20th St.
35,900   45,000     17.
2012 N. Oakland St.
45,316   74,300     18.
2011-13 N. Oakland St.
38,440   50,000     Total
$ 765,596
$ 1,242,700
*687 The petition filed by Mrs. Bennett in the instant case describes her receipt of notices from the Internal Revenue Service, her eventual receipt of the January 28, 1985 letter and her subsequent payment of the "corrected bill," and argues that: The Commissioner erred in failing to acknowledge that the gift tax return in this case has already been adjusted by the Internal Revenue Service, that a corrected bill was sent by the Service to the petitioner, that this corrected bill has been paid in full, and that on this basis this case should be dismissed. OPINION Equitable Estoppel
Petitioners argue equitable estoppel against respondent with respect to the gift tax liability of Mrs. Bennett, based on the contacts Mrs. Bennett had with respondent's agents, which culminated in the January 28, 1985 letter and Mrs. Bennett's subsequent payment of $ 4,306.25. Respondent argues for the first time in his reply brief that equitable estoppel is not an issue in the instant case because it was not raised properly in petitioners' pleadings, and further argues that, even if equitable estoppel is an issue in the instant case, the conditions for equitable estoppel have not been satisfied *688 by the evidence offered by petitioners. For the reasons discussed below, and assuming that equitable estoppel is an issue in the instant case, we agree with respondent that the prerequisites to the application of equitable estoppel are absent. It is well established that "the doctrine of equitable estoppel is applied against the Government 'with utmost caution and restraint.'" Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987), cert. denied 484 U.S. 896 (1987) (quoting Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977)); Kronish v. Commissioner, 90 T.C. 684, 695 (1988). Estoppel may be invoked against the Commissioner where a taxpayer would otherwise sustain "such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury." Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), affg. *689 32 T.C. 998 (1959) and revg. 32 T.C. 1017 (1959). Among the conditions which must be satisfied before the doctrine of equitable estoppel may be invoked against a particular party are: (1) the existence of a false representation or wrongful, misleading silence by that party, (2) reasonable reliance by the other party on that false representation or wrongful, misleading silence, and (3) a resulting detriment to the party relying on the false statement or misleading silence. [3]Kronish v. Commissioner, supra.
In the instant case, petitioners base their claim of estoppel on the January 28, 1985 letter and the "18 month silence" on the part of respondent subsequent to Mrs. Bennett's payment *690 of the $ 4,306.25 and prior to respondent's issuance of a statutory notice of deficiency. We reject petitioners' arguments for several reasons. First, petitioners have failed to convince us that the instant case is one involving "the level of detriment necessary to bring the instant case within the category of those 'rare instances' where respondent should be estopped." Boulez v. Commissioner, supra at 216. At trial, the only evidence of "detriment" offered by petitioners was the testimony of Mr. Michael W. Bennett (referred to herein as "Mr. Bennett"), an administrator of decedent's estate. Mr. Bennett testified that the "detriment" suffered by his mother, Mrs. Bennett, consisted primarily of emotional distress due to worrying about the gift tax return and the "running" of interest. Mr. Bennett also stated that his mother had been harmed by respondent's delay, which prevented her from expeditiously resolving the issue of her gift tax liability, and testified as to the amount of legal fees incurred and interest expense which could have been saved had the matter been resolved earlier. Neither the emotional distress alleged in the instant case nor the delay occasioned *691 by respondent's deliberation over the Bennetts' gift tax returns are sufficient grounds for the application of equitable estoppel against respondent. The accumulation of interest (and Mrs. Bennett's worries about the accumulation of interest) could have been prevented by the Bennetts through making a remittance pursuant to Revenue Procedure 84-58, 1984-2 C.B. 501. Moreover, the accumulation of interest expense is not a "detriment" in the case of underpaid taxes of a taxpayer who has benefitted, for the term of the underpayment, from the interest-free use of funds legally due and owing to the Commissioner. Cf. Thomas v. Commissioner, 92 T.C. 206, 227 (1989) (absence of continued windfall not equivalent to "detriment" for purposes of estoppel against Government). Petitioners' argument with respect to emotional distress also lacks merit; many taxpayers suffer some level of anxiety during an audit, and such anxiety certainly is not the type of detriment necessary to entitle a taxpayer to the extreme remedy of estoppel. See *692 Graff v. Commissioner, 74 T.C. 743, 764 (1980), affd. 673 F.2d 784 (5th Cir. 1982) (taxpayer's unhappiness at not securing expected tax advantages falls short of "detriment" necessary for estoppel). Petitioners' argument that they incurred unnecessary legal fees is also without merit; the legal fees directly resulted from petitioners' decision to contest respondent's notices of deficiency, and not from respondent's delay in issuing notices of deficiency. On brief, petitioners argue for the first time, as an additional indication of "detriment," that, if respondent had started his audit "promptly" after he received the gift tax return in April 1984, petitioners could have obtained appraisals while the properties were still in the same condition as they were at the time of the gifts. We reject that argument because petitioners could have obtained appraisals at the time of the gift (which was made approximately one year before the gift tax returns were filed), and, in any event, could have obtained such appraisals in August 1984, after the first indication from respondent's agents that there was a potential problem with the returns. Instead, five months *693 passed between Mrs. Bennett's receipt of the initial notice from respondent's agents (in August 1984) and the receipt of the January 28, 1985 letter, during which time appraisals could have been made. Furthermore, Mr. Bennett testified at trial that a few months after the January 28, 1985 letter was received by Mrs. Bennett, Mr. Brooks made requests for additional information, and Mr. Bennett responded by obtaining inspection reports for certain of the properties. Respondent's continued interest in petitioners' case during the spring of 1985 indicates to us that petitioners' failure to obtain appraisals of the properties until the spring of 1988 was their own fault, not any fault of respondent's. Finally, we note that, although petitioners argue that respondent's delay prevented them from obtaining an appraisal of the properties at an early date, petitioners have introduced into evidence an expert's appraisal report which purports to value the properties as of the date of the gift. Petitioners' estoppel argument seems to assume some infirmity in that report caused by respondent's delay. As we have noted, however, we do not think petitioners were prevented by respondent from obtaining *694 an earlier appraisal. Thus, petitioners have not demonstrated any type of "detriment" upon which an estoppel could be predicated. Our holding that petitioners have not proved the existence of a "detriment" necessary to invoke estoppel against respondent is not meant to suggest that the other conditions required to invoke this doctrine have been met in the instant case. As noted above, a taxpayer's reliance on false statements or misleading silence by respondent cannot form the grounds for an estoppel unless such reliance is "reasonable." Schuster v. Commissioner, 312 F.2d at 318; Graff v. Commissioner, 74 T.C. at 763; Estate of Emerson v. Commissioner, 67 T.C. 612, 619-620 (1977); Hudock v. Commissioner, 65 T.C. 351, 363 (1975). In the instant case, any reliance by Mrs. Bennett on the January 28, 1985 letter (for the proposition that Mrs. Bennett's gift tax liability for 1983 was immune from further consideration or challenge by respondent) would not have been reasonable. The January 28, 1985 letter, the original of which was submitted into evidence in the instant case, is more properly described as a "note;" *695 it is handwritten in blue ink on a small sheet of notepaper measuring approximately five inches by eight inches. The note, moreover, which was signed simply "Suzanne Battles," with a telephone number, contains no indication of Ms. Battles' position or title at the "Problem Resolution Office," and petitioners have presented no evidence suggesting that Ms. Battles had the actual or apparent authority to enter into any sort of "binding resolution" of Mrs. Bennett's gift tax liability for 1983. See Boulez v. Commissioner, 810 F.2d at 218 n.68 (persons entering into arrangements with agents of the Government must ascertain that such agents stay within the bounds of their authority); Graff v. Commissioner, 74 T.C. at 762-763 (representations by HUD officials as to tax treatment of certain payments did not bind Commissioner where HUD officials were acting beyond the scope of their authority in making tax representations). Finally, the January 28, 1985 letter does not contain any statements indicating that respondent intended to foreclose the possibility of commencing a de novo investigation of Mrs. Bennett's gift tax liability for 1983. *696 Thus, any reliance by Mrs. Bennett on the January 28, 1985 letter for that proposition would have been the result of Mrs. Bennett's "mistake as to the legal effect" of the note, and hence insufficient to invoke estoppel against respondent. Service Bolt & Nut Co. Trust v. Commissioner, 78 T.C. 812, 822 (1982), affd. 724 F.2d 519 (6th Cir. 1983) (respondent may not be estopped by taxpayer mistake as to legal effect of notice of abatement). See also Estate of Emerson v. Commissioner, supra (Commissioner's acceptance of payment did not constitute a "representation" by Commissioner). Another requirement for estoppel which may not have been satisfied in the instant case is that there be a "false statement or misleading silence" by respondent. Petitioners emphasize the "18 months" of allegedly misleading silence by respondent immediately preceding the issuance of a notice of deficiency. However, Mr. Bennett's testimony that inspection reports for some of the properties were submitted to Mr. Brooks at the commencement of this 18-month period weighs against a conclusion that respondent's silence was "misleading;" petitioners should have *697 realized that Mr. Brooks would be reviewing the inspection reports with a view toward evaluating their gift tax liability, and could have contacted Mr. Brooks during this period concerning his review. Accordingly, we hold that respondent is not estopped from asserting the deficiency herein against Mrs. Bennett.
Respondent's Motion to Amend Answer to Assert Increased Deficiency
Subsequent to the conclusion of trial in the instant case, respondent moved pursuant to Rule 41(b)(1) [4] to increase the deficiency asserted against petitioners based upon respondent's expert appraisal report, which assigned a higher value to the properties (on an aggregate basis) than that determined in the notices of deficiency. Petitioners argue that respondent's motion to conform the pleadings to the proof should be denied because: (1) section 6214(a)[5] requires a claim for increased deficiency to be asserted before the conclusion of trial, (2) counsel for petitioners was first advised of the amount of respondent's appraisal on May 6, 1988 and first received a copy of the appraisal report on May 9, 1988 (trial began on May 25, 1988), and (3) petitioners are surprised by the motion to amend and *698 will be prejudiced if it is granted. For the reasons discussed below, respondent's motion to amend his answer will be granted. Petitioners' argument that section 6214(a) requires a claim for increased deficiency to be asserted at or before the conclusion of the "trial" of a case runs contrary to the well-established rule that the word "hearing," as used in section 6214(a), encompasses the entire "proceeding" up until *699 the decision of the Tax Court has been entered. Henningsen v. Commissioner, 243 F.2d 954 (4th Cir. 1957), affg. 26 T.C. 528 (1956); Law v. Commissioner, 84 T.C. 985, 989 (1985). Accordingly, respondent's motion to amend does not violate section 6214(a). Petitioners' argument that they did not receive respondent's expert appraisal report until 16 days prior to trial also lacks merit. We believe that counsel for petitioners had adequate time in which to review respondent's expert report and to prepare a cross examination of respondent's expert; [6] petitioners' counsel did in fact cross examine respondent's expert concerning his methodology. That leaves us with petitioners' final argument that the granting of respondent's written motion to amend *700 would result in prejudicial surprise to petitioners. We disagree. We believe that the relatively short time period during which petitioners were in possession of respondent's expert report is an insufficient indication of prejudicial "surprise" under the circumstances of the instant case. Petitioners never objected at trial to the introduction into evidence of the higher values found by respondent's expert. Moreover, counsel for petitioners made specific reference to the aggregate value found by respondent's expert in his opening statement, and cross examined respondent's expert regarding those findings, suggesting that the issue of values higher than those determined in the notices of deficiency was tried with at least the implied consent of petitioners. Rule 41(b)(1). Although petitioners argue prejudicial surprise, they have given us no indication of the manner in which they would be prejudiced by the granting of respondent's motion, and we do not see any obvious prejudice. After receiving the report of respondent's expert, petitioners never requested additional time from this Court because of their alleged surprise to employ another expert or to have their expert alter *701 his analysis in some manner. Because petitioners did not ask for such additional time, we conclude that they decided that it was not necessary. The basic issue in the instant case -- the fair market value of the properties -- was always at issue and was not altered by the higher aggregate total found by respondent's expert. The fact that the petitioners may have to pay more tax than would be expected from the notice of deficiency might be prejudicial in some other setting but it is not prejudicial under the facts of the instant case. We find that justice requires that we allow respondent's answer to be amended. Rule 41(a). Accordingly, respondent's motion to amend his answer to conform to the evidence so as to assert an increased deficiency will be granted. Respondent has the burden of proving, however, that petitioners are liable for the increased deficiency. Rule 142(a). Value of the Properties
The parties in the instant case rely primarily on the reports of their expert witnesses for their varying arguments over the values of the properties. We have compared the qualifications and experience of the parties' experts, as well as the substance and reasoning of *702 their reports, and find respondent's expert generally superior in all of such categories. We note, however, that we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kries v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. While we may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of such an opinion. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Section 2512(a) provides that, if a gift is made in property, the value of the property at the date of the gift shall be considered the amount of the gift. Both expert reports in the instant case were prepared approximately five years after the gift and attempt to establish a "retrospective" value for the properties as of March, 1983. Respondent's Valuations
Respondent's expert report was prepared by Lawrence I. McGuire and Lawrence I. McGuire, Jr. of Larry McGuire and Associates, an Alexandria, Virginia firm specializing in appraising. The *703 firm, which includes six staff appraisers, generally makes about 2,000 - 3,000 appraisals per year, and the firm's most significant clients are the FHA, VA, and Sovran Bank. [7] Mr. McGuire, Sr. is eminently qualified as an appraiser, having achieved the appraiser designation from the National Association of Independent Fee Appraisers in 1975, which designation requires that one submit a report similar to a college thesis. Mr. McGuire's work consisted exclusively of appraising for about ten years prior to the trial of the instant case; he generally undertakes about ten appraisals per week. Prior to becoming a specialist in appraising, Mr. McGuire, Sr. worked for over ten years as a real estate salesman and broker in Virginia. Mr. McGuire, Jr. worked as an appraiser for approximately eight years prior to the trial of the instant case and completed all course requirements for a designation from the American Institute of Real Estate Appraisers (the only remaining requirement being a written thesis). *704 We found respondent's expert report (sometimes referred to herein as the "McGuire report") generally quite useful and persuasive, except as discussed below with respect to its six "shell" valuations. The report concluded that the "highest and best use" of the properties was residential, and valued the properties using the "comparable sales" method, which involves gathering information on sales of property similar to the subject property, then making adjustments for various differences between the "comparables" and the property being appraised. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987). [8]The "comparable sales" method is a commonly accepted method of appraising residential real estate. Expert opinions based on the comparable sales method have been found probative by this Court on numerous occasions. Estate of Stanton v. Commissioner, T.C. Memo. 1989-341; Estate of Harms v. Commissioner, T.C. Memo. 1981-320; Black v. Commissioner, T.C. Memo. 1968-247. *705 We find little merit in petitioners' contention that, because the properties were predominantly held for rental by the Bennetts, the McGuire report was deficient in its failure to use the "income capitalization" method of valuation. The income capitalization method determines fair market value by considering the present value of the stream of future income (e.g., rents) to be produced by the property, and is utilized for income producing property. The McGuire report explains that the income capitalization method was not used therein because "this method is not practical in the case of single family and, very often, small multi-family properties, as single family properties are not generally bought and sold for the purpose of producing income streams, as evidenced by the predominance of owner occupancy in such units and small multi-family properties are generally brought by individuals for tax purposes." The properties included 15 single-family dwellings and two duplexes, and petitioners' expert testified that the majority of the houses in the neighborhood in which the properties were located were in fact owner-occupied. We therefore find the explanation given in the McGuire report *706 concerning the inapplicability of the income capitalization method sufficient. [9] Moreover, petitioners' argument about the deficiency of the McGuire report appears to overlook the fact that petitioners' own expert made no use of the income capitalization method. Petitioners' expert testified at trial that the comparable sales method is the method of choice for valuing residential property. In determining the reliability of an expert opinion based on the comparable sales method, we examine the property sales which the expert treated as "comparable" to determine whether they are adequately comparable for such purpose. See, e.g., Estate of Spruill v. Commissioner, supra; Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, affd. 687 F.2d 224 (7th Cir. 1982), cert. denied *707 460 U.S. 1011 (1983) (citing the various elements of comparability which existed between the subject property and the properties used as "comparables" by the Commissioner's expert); Jacobson v. Commissioner , T.C. Memo. 1989-606 (finding most of the property sales used by the Commissioner's experts "noncomparable"). Petitioners' only criticism of the " comparables" utilized by respondent's expert is the argument (made in petitioners' reply brief) that the "comparables" chosen by respondent's expert were insufficient because they were "owner-occupied properties," as compared with the "poorly maintained rental properties" under consideration in the instant case. Petitioners have presented no evidence indicating that the comparables used by respondent's expert were "owner-occupied properties" and, in any event, we find petitioners' criticism without merit. Petitioners' own expert testified that the value of owner-occupied properties is not necessarily different than the value of rental properties because rental properties, like owner-occupied properties, may be well-maintained by their owners. Moreover, the McGuire report took into account the poor maintenance *708 of many of the properties in reaching its conclusions as to value (by subtracting value from the sales price of "comparables" which were in better condition), rather than disregarding the maintenance factor as suggested by petitioners' argument. Petitioners' second criticism of respondent's expert report is that it does not include separate values for land as opposed to improvements. We find that the failure to include separate values for the land is not significant because the McGuire report relied on data concerning sales of comparable residences, the sales prices of which apparently were not allocated between land and improvements. The McGuire report divided its valuations of the properties into 12 "regular" and 6 "shell" valuations. The six houses which were treated as "shells" in the McGuire report were located at 2005 N. Nelson Street, 1817 N. Oakland Street, 1813 N. Oakland Street, 3713 N. 20th Street, 3715 N. 20th Street, and 2011-2013 N. Oakland Street. The report cited, as the reason for valuing those properties as "shells," the fact that they were in "such dilapidated condition in March of 1983, that the degree to which they contributed to the value of the property *709 as a whole is questionable." The following chart compares the values determined in the statutory notices of deficiency with the values determined by respondent's expert. Value Determined in
Value Determined by
Property
Statutory Notices
Respondent's Expert
3400 N. 21st Ave.
$ 82,200 $ 91,000   1908 N. Nelson St.
$ 74,500 $ 83,000   2005 N. Nelson St.
$ 50,000 * $ 61,400 1912 N. Nelson St.
$ 47,000 $ 89,000   3406 N. 21st Ave.
$ 55,000 $ 87,000   1904 N. Nelson St.
$ 90,500 $ 99,000   2124 N. Quebec St.
$ 83,700 $ 90,000   1817 N. Oakland St.
$ 73,000 * $ 65,500 1901 N. Oakland St.
$ 87,800 $ 82,000   3402 N. 21st Ave.
$ 103,900
$ 108,000  1913 N. Quebec St.
$ 66,600 $ 83,000   1813 N. Oakland St.
$ 45,000 * $ 42,300 3412 N. 21st Ave.
$ 82,500 $ 90,000   1814 N. Stafford St.
$ 86,300 $ 85,000   3713 N. 20th St.
$ 45,000 * $ 53,300 3715 N. 20th St.
$ 45,000 * $ 52,100 2012 N. Oakland St.
$ 74,300 $ 82,000   2011-2013 N. Oakland St.
$ 50,000 * $ 81,200 Where *710 the value determined by respondent's expert is less than that determined in the statutory notices of deficiency, we interpret such a determination as a concession by respondent. As noted above, where the value determined by respondent's expert exceeds the value determined in the statutory notices of deficiency, respondent bears the burden of proof as to the increase in value. Rule 142(a). Otherwise, petitioners bear the burden of proof. Rule 142(a). Respondent's notice of deficiency is presumptively correct. Welch v. Helvering, 290 U.S. 111 (1933). We find the regular (i.e., "non-shell") valuations determined in the McGuire report to be generally reliable and, as discussed below, have adopted the majority of those findings. For each "non-shell" property, respondent's expert report presented data on three "comparable sales." We find that sufficient elements of comparability existed between the subject properties and the "comparable sales" chosen by respondent's expert to render data concerning those comparable sales relevant. All of the "comparable sales" involved residential properties located within a 6-block radius of the subject properties. The subject *711 properties were constructed between 1900 and 1930, and all of the comparable sales involved residences built between 1905 and 1940. The gift took place in March, 1983, and all of the comparable sales utilized by respondent's expert occurred within an eight-month period of the gift (most of the comparable sales actually occurred within 3 months of the gift). [10] The size of the residences involved in the comparable sales also was within the general size range of the properties. Moreover, the "comparables" presented in the McGuire report were chosen from a larger selection of data on residential sales reviewed by respondent's expert before preparing the report. Respondent's expert obtained information about the condition of the subject properties at the time of the gift from photographs and visual inspections (after renovation), county records, and interviews with Mr. Bennett and with subsequent owners of the properties. In arriving at a value for each of the "non-shell" *712 properties, respondent's expert made additions or subtractions, as deemed necessary, for differences between the properties and the comparables. The additions and subtractions were based on, among other factors: the condition of the property, the number of rooms and gross living area, the presence of extra bedrooms or bathrooms, porches or patios, special energy efficient items, fireplaces, finished basements, or remodeled kitchens, and the proximity of the property to a busy street. We found those comparisons, which were presented in the McGuire report on standard forms utilized by appraisers, to be quite useful and reliable. We also find it significant that petitioners have not criticized the comparables chosen by respondent's expert as inappropriate (except for the broadbrush statement on brief that owner-occupied residences are not comparable to rental properties) and have raised no objections concerning the computations performed by respondent's expert in deriving values for the subject properties from the comparable sales. We find the "shell" valuations contained in the McGuire report less useful and reliable than the other valuations presented in the report. In arriving *713 at a value for each of the subject "shells," respondent's expert used data concerning the sales of two residences and one vacant lot, which took place within 11 months of the gift. The main flaw in respondent's expert's "shell" valuations, however, was the lack of explanation presented. While the report states in the case of each "shell" that "adjustments were considered for significant differences between the comparables and the subject," no further explanation of those differences or of the adjustments deemed appropriate for those differences is given. Furthermore, in the case of the vacant lot used as a comparable, neither the location of the vacant lot (other than its "tax map" number) or its distance to the subject properties is disclosed. Thus, in arriving at our conclusions as to the value of the properties treated as "shells" in the McGuire report, we found the report insufficient to satisfy respondent's burden of proving the values in excess of those determined in the statutory notice of deficiency. Petitioners' Valuations
Petitioners' expert, Mr. Robert Groom, is intensely familiar with the neighborhood in which the properties are located by reason of his 38 *714 years' experience (as of the date of trial) as a licensed real estate broker in Arlington County, Virginia. Mr. Groom's experience in preparing appraisal reports, however, is quite limited, as Mr. Groom is not involved in the appraising business to any significant degree. Mr. Groom never took any of the formal appraisal courses offered by the appraisal societies, and at trial, Mr. Groom testified that: I don't advertise as an appraiser, although I have been called upon to appraise over the years from time to time. I avoid appraising all that I can because I'd rather be doing other aspects of the business, so I don't hold myself out as an available appraiser. [Emphasis supplied.] We therefore find petitioners' expert's qualifications inferior to those of respondent's expert. See Crane v. Commissioner, 49 T.C. 85, 95 (1967) (giving greater weight to testimony of Commissioner's expert where taxpayers' experts based valuations on "subjective knowledge" of local real estate market and lacked "the qualifications as an appraiser, as distinguished from a dealer in real estate, that the respondent's expert had"). Of the 18 properties, petitioners' expert had *715 a personal familiarity with the two duplexes (at 3713/3715 N. 20th Street and 2011-2013 N. Oakland Street) and with one single family dwelling (at 2012 N. Oakland Street) during the year in issue. We have taken petitioners' expert's descriptions of the condition of those properties during 1983 into account in reaching our ultimate conclusions as to the value of those properties. Even more problematic than petitioners' expert's lack of experience as an appraiser are the flaws in the substance of his report. As indicated in the following chart, the values determined by petitioners' expert for "land" were the same as the assessed values of the land (for Virginia real property tax purposes) in the case of 13 of the 18 properties. Assessed Value
Value Determined by
Property
(Arlington County)
Petitioners' Expert
1. 3400 N. 21st Ave. Land- $ 41,800  Land- $ 41,800  Bldg. - 40,400  Bldg. - 25,000  2. 1908 N. Nelson St. Land- 41,400    Land- 41,400    Bldg. - 33,100  Bldg. - 10,000  3. 2005 N. Nelson St. Land- 42,200    Land- 42,000    Bldg. - 26,400  [11] ldg. - (5,000)   4. 1912 N. Nelson St. Land- 41,400    Land- 41,400    Bldg. - 30,400  Bldg. - 10,000  5. 3406 N. 21st Ave. Land- 45,300    Land- 45,300    Bldg. - 37,200  Bldg. - 10,000  6. 1904 N. Nelson St. Land- 41,800    Land- 41,800    Bldg. - 48,700  Bldg. - 33,200  7. 2124 N. Quebec St. Land- 43,500    Land- 43,500    Bldg. - 40,200  Bldg. - 20,000   8. 1817 N. Oakland St. Land- 42,200    Land- 42,200    Bldg. - 30,800  Bldg. - 10,000  9. 1901 N. Oakland St. Land- 42,200    Land- 42,200    Bldg. - 45,600  Bldg. - 10,000  10. 3402 N. 21st Ave.
Land- 41,800    Land- 41,800    Bldg. - 62,100  Bldg. - 15,000  11. 1913 N. Quebec St.
Land- 41,800    Land- 41,800    Bldg. - 24,800  Bldg. - 10,000  12. 1813 N. Oakland St.
Land- 42,200    Land- 42,200    Bldg. - 15,800  Bldg. - (5,000)  13. 3412 N. 21st Ave.
Land- 45,800    Land- 45,800    Bldg. - 41,900  Bldg. - 10,000  14. 1814 N. Stafford St.
Land- 42,200    Land- 42,200    Bldg. - 44,100  Bldg. - 10,000  15. 3713 N. 20th St.
Land- 40,500    Land- 25,000    Bldg. - 20,700  Bldg. - (5,000)  16. 3715 N. 20th St.
Land- 40,500    Land- 25,000    Bldg. - 20,200  Bldg. - (5,000)  17. 2012 N. Oakland St.
Land- 42,600    Land- 55,000    Bldg. - 31,700  Bldg. - (5,000)  18. 2011-2013 N. Oakland
Land- 41,800    Land- 50,000    St. Bldg. - 45,400  Bldg. - (5,000)  *716 On cross examination, petitioners' expert stated that he adopted the Virginia assessed values for those 13 parcels of land "purposely" because: the County tended to be, in my opinion, very much in line on the land values in here, the lot values * * * And I thought Arlington County's land approximations on this were close enough that why quarrel with them. I mean, if it's close enough to -- how could we be more exact. The above-quoted testimony suggests that petitioners' expert used the assessed values because they were "as good as any other" approximation, rather than making an independent effort at determining fair market value. Petitioners' expert's use of assessed values for land is further discredited by a statement contained in his own report that the Arlington County assessors, in assigning a value to land, "had a policy of no personal inspection, but assigned a square foot value on land for a general section of Arlington" which value did "not take into account the narrowness of some lots or the immediate surrounding properties." (Petitioners make a similar argument on brief, apparently *717 to criticize respondent's use of assessed values in the statutory notices of deficiency.) Petitioners' expert report also appears internally inconsistent in that it states that, during 1983, the fair market values of most properties in Arlington County were approximately 10 percent above their assessed values for Virginia real property tax purposes (based on the assumption that the improvements were in reasonably good condition). At trial, petitioners' expert indicated that such 10 percent variation applied only to improvements and not to vacant land. On cross examination, however, petitioners' expert admitted that he was not aware of any vacant lots for sale in the neighborhood of the properties during 1983. Based on the foregoing, we find significant fault with petitioners' expert's use of assessed values to value 13 of the 18 parcels of land. While we recognize that assessed values may be "considered" as an indicator of fair market value, assessed values are relevant only when the relationship between assessed value and fair market value is demonstrated. Section 25.2512-1, Gift Tax Regs. Moreover, even if such relationship is demonstrated, assessed values generally *718 are used "basically as a corroboration of fair market value determined by a more reliable method." Northern Trust Co., Transferee v. Commissioner, 87 T.C. 349, 382 (1986), affd. on another issue sub nom. Citizens Bank and Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988); Emmet v. Commissioner, 11 T.C. 90, 95 (1948); Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, affd. 687 F.2d 224 (7th Cir. 1982), cert. denied 460 U.S. 1011 (1983); cf. Estate of Kaplin v. Commissioner, T.C. Memo. 1987-337. See also Jacobson v. Commissioner, T.C. Memo. 1989-606, n.6. Virginia law provides that assessed value is intended to represent 100 percent of fair market value, Code of Virginia, Chapter 32, section 58.1-3201 (1984), which suggests a "relationship" between assessed value and fair market value. Estate of Kaplin v. Commissioner, supra; Estate of Frieders v. Commissioner, supra.The weight of the evidence, however, suggests that the Arlington County assessments, taken in isolation, were not reliable indicators *719 of the fair market value of individual parcels of property. As petitioners' expert used those assessments exclusively in the case of 13 parcels of land, rather than as a corroboration of value determined by another method, we give little weight to his conclusions regarding the value of those parcels. Emmett v. Commissioner, supra.[12]
Petitioners' expert's land valuations with respect to the other five parcels also appear unreliable. In the case of the land at 2005 N. Nelson Street, petitioners' expert appears to have dropped $ 200 from the assessed value, probably through rounding or through a typographical error. Petitioners' expert's stated reason for valuing the land at 2012 N. Oakland Street at $ 55,000 (as compared with its assessed value of $ 42,600) is that the land was "more valuable than most of the other 17 lots, because of its size and location." Such reasoning is inadequate to explain petitioners' expert's choice of $ 55,000; it also strongly discredits his adoption of assessed values for 13 other lots. In the case of the duplex at 3713/3715 N. 20th Street, *720 petitioners' expert appraised the land at $ 25,000 for each half of the duplex (as compared with an assessed value of $ 40,500 per lot). His explanation of his appraisal is confusing; the report states that land is appraised at "1/2 building lot" but does not explain the choice of a value of $ 25,000 for a lot assessed at $ 40,500. Petitioners' expert's appraisal of the land at 2011-2013 N. Oakland Street also lacks meaningful explanation. Another significant flaw in petitioners' expert report is its failure to use any recognized method of appraisal in reaching its conclusions as to value. At trial, petitioners' expert admitted that he had deliberately not presented any "market comparables" in his report because he knew that the properties followed a "uniform pattern" of little or no maintenance and knew that their assessed values were based on the untrue assumption that the properties were in good or reasonably good condition. Although petitioners' expert stated that he used the market comparable approach "in arriving at the figures in my mind," such subjective knowledge, when not expressed in some rational and organized fashion for our review, cannot be tested for flaws and *721 is of little probative value. Petitioners' expert report suffers from a lack of reasoning; its comments on individual properties generally are extremely cryptic and subjective, e.g., for the property at 1814 N. Stafford Street (which was valued at the assessed value of the land plus $ 10,000), the appraisal is prefaced with the statement: "Older but sound structure; Much updating & repair needed." Similar comments are contained throughout petitioners' expert report as "explanations" of the other values found by petitioners' expert. As we stated in Emmet v. Commissioner, supra at 95, (quoting 10 J. Mertens, Law of Federal Income Taxation, sec. 5904, p.446 (1948)), for an expert opinion to have any persuasive force, it "should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based. The facts must corroborate the opinion; otherwise the opinion will be discounted." Petitioners' expert report fails to present such underlying facts in any meaningful manner. In valuing the subject improvements, petitioners' expert assigned a value of $ 10,000 to 8 of the 18 structures. At trial, when asked about his choice of the *722 "$ 10,000" figure for those improvements, petitioners' expert admitted that $ 10,000 was "an arbitrary figure," which represented the amount of money he thought he would save, in the building and restoration process, by not having to construct a new "shell" for those structures. Petitioners' expert also stated that his selection of amounts between $ 15,000 and $ 20,000 for certain other improvements were "estimates in his mind" of what the "shells" were worth, based on their square footage. Regarding his selection of a value of $ 25,000 for the improvement at 3400 N. 21st Avenue, petitioners' expert's only explanation was that that improvement was one of the largest of the 18 properties and one in the best condition. Based on the lack of reasoning in his report and on his testimony at trial, we find petitioners' expert's valuation of the majority of the improvements -- at $ 10,000, $ 15,000, $ 20,000, or $ 25,000 -- highly arbitrary and unpersuasive. The photographs of the properties as they were in 1983 (which were submitted into evidence by both of the parties in the instant case), indicate that the condition of the properties during 1983 differed on a property-by-property basis. *723 Unlike the McGuire report, petitioners' expert report ignores those differences in condition, oversimplifying matters by treating the vast majority of the properties as "shells" (or as structures to be demolished) based on the assumption that all of the properties followed a "uniform pattern of disrepair." We believe that petitioners' expert made that general assumption based on his personal knowledge of four of the properties during 1983 and on his discussions with Mr. Bennett. The only improvement which was not assigned a value of $ 10,000, $ 15,000, $ 20,000, or $ 25,000 by petitioners' expert (or assigned a "demolition cost" of $ 5,000) was the improvement at 1904 N. Nelson Street, to which petitioners' expert assigned a value of $ 33,200. The only reason cited in his report for that value is that the property was "Basically sound, much repairs and updating needed" (a description much like his description of other properties in the report). Absent any further explanation for that selected value, we find it of little probative worth. We also find fault in petitioners' expert's subtraction of $ 5,000 in "valuing" six of the improvements. Petitioners' expert subtracted $ 5,000 *724 in his report because of his view that those improvements should have been demolished. The evidence, however, indicates that, of those six properties, five were actually rehabilitated and sold rather than being demolished. When questioned about the inconsistency between his report and the actual history of the properties, petitioners' expert stated that: Well, some of them were bigger, sturdier houses to begin with and while they needed painting and redecorating, they didn't need as much, but they weren't the type of shells that were dangerous, they just needed upgrading. And they were very rehabbable. Some are rehabbable, some are not. At another point in the trial, petitioners' expert indicated that he thought the decision to rehabilitate those properties was a poor business judgment on the part of Mr. Bennett. Such view is weakened by the fact that Mr. Bennett was sophisticated in real estate matters; he is a mechanical engineer who has worked with a real estate development and property management company. Based on the foregoing evidence, we find petitioners' expert's subtraction of demolition costs for five of the six properties to which he assigned such costs *725 unreliable. The amount ($ 5,000) chosen by petitioners' expert for demolition costs also appears arbitrary; at trial, petitioners' expert testified that demolition costs range from $ 2,500 to $ 5,000, but he uniformly subtracted $ 5,000 (without explanation) in his report. As discussed below, however, we agree that the subtraction of demolition costs was appropriate in the case of the property at 1813 N. Oakland Street. Other Evidence
Beers Report
In addition to the report of their expert, petitioners submitted into evidence inspection reports for 11 of the properties prepared by Mr. Beers, a residential building inspector. Those inspection reports were quite detailed and in certain instances characterized properties as being in an extreme state of disrepair or dilapidation. However, because the reports were all prepared more than two years after the gift (five of the reports were actually prepared more than three and a half years after the gift) and contain no quantitative information which could be used to value the properties, we have given them little weight in reaching our conclusions. Testimony of Mr. Michael Bennett
Mr. Bennett testified as to the amount *726 of money and labor he invested, after the gift, in renovating certain of the properties before they were sold to third parties. In the case of the property at 2012 N. Oakland Street, for example, which sold for $ 140,000 in March 1985, Mr. Bennett testified that he spent approximately $ 60,000 in cash and invested approximately $ 60,000 in his own labor to bring the property into the condition in which it was sold. When asked whether he had brought to trial receipts for the amounts allegedly spent on renovating that property, however, Mr. Bennett stated: "It's available. I didn't bring it with me because I didn't think it was relevant at this time, but I can make that available." As petitioners made no effort at any time prior or subsequent to Mr. Bennett's testimony to introduce receipts for his renovation expenditures into evidence, we give no weight to Mr. Bennett's unsupported testimony about such expenditures. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We are not required to accept petitioners' self-serving testimony as gospel. *727 Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Testimony of Mr. Rice
Respondent called as a witness Mr. Thomas Rice, Director of the Department of Real Estate Assessments for Arlington County, Virginia. Mr. Rice testified that a study performed by the Virginia State Department of Taxation, known as the "Assessment Sales Ratio Study," indicated that, in Arlington County for the year 1983, the median ratio of assessed values to sales price was 91.9 percent. Respondent has introduced that "ratio" into evidence to bolster his expert's determination of value. [13] We find, however, that the probative value of data from the study for the purpose of ascertaining the fair market value of individual properties is minimal. Mr. Rice, when asked by counsel for respondent how one would determine the fair market value of an individual property from the median ratio, did not provide such computation but stated that "the 91.9 percent is the median ratio, so that represents a major central tendency while it may not be accurate for all properties." Respondent's expert also testified that the results of the study could not be uniformly applied to determine the values of individual *728 properties. Mr. Rice also testified that during 1983, there were approximately eight assessors in Arlington County responsible for assigning values to approximately 48,000 pieces of property. Mr. Rice's testimony concerning Arlington County assessment practice strongly discredited petitioners' expert's reliance on assessed values, discussed above. Values of the Properties
Based on our consideration of all of the evidence, we hold that the values of the properties as of the date of the gift are as follows: 1. 3400 N. 21st Ave. We adopt the value of $ 91,000 found by respondent's expert. 2. 1908 N. Nelson St. We adopt the value of $ 83,000 found by respondent's expert. 3. 2005 N. Nelson St. We find that respondent has failed to meet his burden of proving value in excess of that determined in the statutory notices of deficiency. We therefore hold that the value of the property was $ 50,000 as determined in the statutory notices of deficiency. Petitioners have failed to prove a lower value. Rule 142(a). *729 4. 1912 N. Nelson St. We adopt the value of $ 89,000 found by respondent's expert. 5. 3406 N. 21st Ave. We adopt the value of $ 87,000 found by respondent's expert. 6. 1904 N. Nelson St. We adopt the value of $ 99,000 found by respondent's expert. 7. 2124 N. Quebec St. We adopt the value of $ 90,000 found by respondent's expert. 8. 1817 N. Oakland St. We adopt the value of $ 65,500 found by respondent's expert and interpret such value as a concession, in that it is less than the value determined in the statutory notices of deficiency. 9. 1901 N. Oakland St. We adopt the value of $ 82,000 found by respondent's expert and interpret such value as a concession, in that it is less than the value determined in the statutory notices of deficiency. 10. 3402 N. 21st Ave. We adopt the value of $ 108,000 found by respondent's expert. 11. 1913 N. Quebec St. We find that respondent has failed to meet his burden of proving a value in excess of that determined in the statutory notices of deficiency. Accordingly, we hold that the value of the property was $ 66,000 as determined in the statutory notices of deficiency. Petitioners *730 have failed to prove a lower value. Rule 142(a). Respondent's expert report valued the property based on the assumption that it was in "average" condition as of the date of the gift. However, the evidence indicates that such assumption was incorrect. Petitioners submitted into evidence a letter dated January, 1982, indicating that the insurance on the property was being cancelled based on the poor condition of the properties. Respondent on brief appears to acknowledge the inconsistency between such letter and his expert's report. [14] The photograph of the property included in respondent's expert report also suggests that the property was in worse than "average" condition at the time of the gift. 12. 1813 N. Oakland St. We find that the value of the property was $ 39,800. The McGuire report indicates that the property was valued as vacant land. *731 The evidence indicates, however, that the improvements on the property were actually demolished subsequent to the gift. Accordingly, we have subtracted a demolition cost of $ 2,500 (the lowest cost of demolition according to petitioners' expert) from the value of $ 42,300 found by respondent's expert. We interpret respondent's expert valuation as a concession in that it is less than the value determined in the statutory notices of deficiency. 13. 3412 N. 21st Ave. We adopt the value of $ 90,000 found by respondent's expert. While several Arlington County violation notices were submitted by petitioners as evidence of the poor condition of the property, only one of such notices related to a date prior to the gift (the others were issued approximately one or two years after the gift). The violation notice issued prior to the gift related to infractions such as vehicle storage, auto repair, illegal signs on the premises, and the occupancy of the premises by more than four unrelated persons. 14. 1814 N. Stafford St. We adopt the value of $ 85,000 found by respondent's expert and interpret such value as a concession, in that it is less than the value determined in the *732 statutory notices of deficiency. 15, 16. 3713/3715 N. 2Oth St. Properties 15 and 16 are the two parts of a duplex. We find that respondent has failed to meet his burden of proving that those properties had a value in excess of that determined in the statutory notices of deficiency. We therefore hold that the value of each part of the duplex was $ 45,000 as determined in the statutory notices of deficiency. Petitioners have failed to prove a lower value. Rule 142(a). In reaching our conclusion, we have taken into account the opinion and testimony of petitioners' expert, who had personal knowledge of the properties during 1983. We also note that respondent's expert report determined a value of $ 105,400 and noted that the two properties were sold for $ 98,000 in 1986. The report, however, failed to reconcile such figures. 17. 2012 N. Oakland St. We find that the value of the property was $ 78,000. In reaching our conclusion, we have given weight to the findings of respondent's expert, who treated the property as being in fair to poor condition at the time of the gift, as well as to the testimony and findings of petitioners' expert, who had personal knowledge of *733 the condition of the property during 1983. We have also considered the Arlington County violation notices submitted by petitioners with respect to the property. 18. 2011-2013 N. Oakland St. We find that respondent has failed to meet his burden of proving a value in excess of that determined in the statutory notices of deficiency. We therefore hold that the value of the property (a duplex) was $ 50,000 as determined in the statutory notices of deficiency. Petitioners have failed to prove a lower value. Rule 142(a). In reaching our conclusion, we have taken into account petitioners' expert's personal knowledge of the property during 1983. We have also taken into account a letter submitted by petitioners from the Inspection Services Division of the Arlington County Department of Community Affairs. That letter to Mr. Bennett, dated August 10, 1983, states that a survey of the property conducted in July, 1983 found the structure "beyond economical repair to be habitable" and instructs Mr. Bennett to repair or demolish the structure within 30 days. The letter also threatens demolition by the County. [15]
*734 We have made a painstaking effort to reach the values we have assigned to the properties. We cannot help but bring to the parties' attention our admonition in Buffalo Tool & Die Mfg. Co. v. Commissioner , 74 T.C. 441, 452 (1980), that our consideration of valuation issues will not always produce a "middle-of-the-road compromise." To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated for trial, briefing, and opinion, which for convenience, we shall hereinafter refer to as the "instant case."↩
2. The record in the instant case does not explain the reason for the discrepancy between the amount which the January 28, 1985 letter stated was owing ($ 3,707.00) and the amount eventually billed and paid ($ 4,306.25).↩
3. Other conditions required for estoppel against the Government are: the error relied upon by the taxpayer must be in a statement of fact and not in an opinion or statement of law, and the taxpayer must have been ignorant of the true facts. Kronish v. Commissioner, 90 T.C. 684, 695↩ (1988). For a useful discussion of estoppel against the Government, see M. Saltzman, IRS Practice and Procedure, section 3.04[9] (1981 and Supp.).
4. All section references are to the Internal Revenue Code, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
5. SECTION 6214. DETERMINATIONS BY TAX COURT. (a) JURISDICTION AS TO INCREASE OF DEFICIENCY, ADDITIONAL AMOUNTS, OR ADDITIONS TO THE TAX. -- Except as provided by section 7643, the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary at or before the hearing or a rehearing.↩
6. As discussed below, respondent's expert appraisal report was prepared by Lawrence I. McGuire and Lawrence I. McGuire, Jr., of Larry McGuire and Associates. Only Mr. McGuire, Sr. testified at trial. Thus, when used in reference to trial testimony, the term "respondent's expert" refers to Mr. McGuire, Sr. Otherwise, the term refers to both preparers of respondent's appraisal report.↩
7. During the year in issue, Mr. McGuire, Sr. and Mr. McGuire, Jr. were partners with a Mr. Chris Petroff in a firm called Petroff, McGuire & Associates, Inc. When the firm split up, Mr. Petroff took all the commercial appraising work and the McGuires retained all the residential appraising work.↩
8. Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, affd. 687 F.2d 224 (7th Cir. 1982), cert. denied 460 U.S. 1011↩ (1983).
9. Estate of Harms v. Commissioner, T.C. Memo. 1981-320↩ (finding comparable sales method more appropriate than income method in valuing houses where there were few renters in the area and structures were of investment type property).
*. indicates "shell" valuation.↩
10. Estate of Frieders v. Commissioner, supra↩ (time differential "pointed to comparability" where "comparables" were sold within one year of the valuation date of the subject property).
11. Numbers in parentheses represent amounts to be subtracted as demolition costs.↩
12. Estate of Sochalski v. Commissioner, T.C. Memo. 1955-19↩.
13. Petitioners have not objected to the introduction of the ratio into evidence. Petitioners make reference to the study in their reply brief.↩
14. Respondent's proposed findings of fact state that "Notwithstanding [the letter], the property at 1913 N. Quebec St. was in 'average' condition in March of 1983." Respondent's references to the letter in his proposed findings of fact also indicate that his evidentiary objections to its admissibility have been waived.↩
15. Respondent's references to this letter on brief in his proposed findings of fact indicate that his evidentiary objections to its admissibility have been waived.↩